*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0150**

State of Minnesota,
Respondent,

vs.

Joseph Harvey Bellanger,
Appellant.

**Filed February 29, 2016
Affirmed
Jesson, Judge**

Beltrami County District Court
File No. 04-CR-14-801

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Annie Claesson-Huseby, Beltrami County Attorney, David P. Frank, Assistant County Attorney, Bemidji, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Roy G. Spurbeck, Assistant Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Cleary, Chief Judge; Jesson, Judge; and Kalitowski, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**JESSON**, Judge

Appellant challenges jury verdicts finding him guilty of kidnapping and false imprisonment, arguing that his attorney improperly conceded guilt during closing argument and that the district court committed plain error affecting his substantial rights by failing to give an accomplice-testimony jury instruction. We affirm.

## FACTS

In the early morning hours of March 14, 2014, R.L. and J.D. used methamphetamine together at the home of J.K. Appellant Joseph Bellanger and several other people were also present. J.K. gave R.L. $200 to purchase more methamphetamine. J.D. lent his car to R.L., and R.L. left the home in search of the drug. R.L. returned a few hours later and picked-up J.D. and John White. J.D. and White dropped R.L. off at a friend's home and made plans to go to a casino.

At approximately 8:00 or 9:00 that evening, J.D. and White arrived at the casino. Bellanger called his friend Robert Jones and told him that they needed to locate J.D. and R.L. and find out what they had done with J.K.'s money. Jones saw J.D. and White and informed Bellanger that J.D. was at the casino.

Bellanger came to the casino and approached J.D. He demanded to know where J.D. had been that day, where R.L. was, and what happened to J.K.'s money. J.D. wanted to continue gambling, but Bellanger insisted that they leave the casino. J.D. testified that Bellanger threatened to stab him if he refused to leave. Bellanger put his hand in his left

pocket and said he had a knife. Casino surveillance video shows J.D. leaving the casino surrounded by Bellanger, Jones, White, and another individual.

The group got into two vehicles that were waiting outside and drove to the residence where J.D. and White had dropped R.L. off earlier in the day. When R.L. came to the door, Bellanger threatened her with a knife. Jones and Bellanger told R.L. that they wanted J.K.'s money. R.L. was frightened and retreated to the home's bathroom. Jones eventually convinced R.L. to leave the home with the group.

Several members of the group then drove to the home of Darlene Wind. Bellanger told J.D. to sit on the toilet and R.L. to sit on a kitchen chair. Bellanger and Jones asked J.D. and R.L. questions about J.K.'s money, while Wind and White went to the casino to retrieve J.D.'s car. R.L. was later ordered to duct-tape J.D. She duct-taped his ankles and wrists.

When Wind and White returned with J.D.'s car, J.D. was "taped up in the tub," and R.L. was sitting on the bathroom floor. Bellanger gave White the duct tape and told him to restrain R.L. White taped R.L.'s hands over her eyes. Bellanger, White, Jones, and Wind continued to question R.L. and J.D. about the missing money. White slapped R.L. and punched J.D. multiple times.

Eventually R.L. and J.D. were moved to the bedroom. Bellanger punched J.D. several times. White also continued to assault J.D. and R.L. White testified that he assaulted J.D. and R.L. at Bellanger's direction.

Bellanger then decided that he wanted to get R.L. and J.D. drunk so that they would not remember the night. Bellanger told Jones and Wind to go purchase liquor.

3

When Jones and Wind returned with the alcohol, Bellanger and White were laughing and talking about how they had poured shampoo down J.D.'s throat and dish soap down R.L.'s throat. On Bellanger's order, White forced J.D. and R.L. to drink the alcohol. R.L. was also forced to pour alcohol down J.D.'s throat.

Using J.D.'s car, Wind and White then drove R.L. and J.D. to an area near a lake. Wind and White intentionally got the car stuck in the snow and left R.L. and J.D. in the vehicle. R.L. and J.D. sought help at a nearby residence, and the police were called.

Bellanger was charged with two counts of kidnapping in violation of Minn. Stat. § 609.25, subd. 1(3) (2012), and two counts of false imprisonment in violation of Minn. Stat. § 609.255, subd. 2 (2012). He was also charged with two counts of aiding-and-abetting kidnapping and two counts of aiding-and-abetting false imprisonment. Prior to Bellanger's trial, both White and Jones pleaded guilty to similar charges. Both made plea agreements that called for them to testify against Bellanger. While in custody, Bellanger said in a recorded phone call, "Bobby and John told on me anyways."

A jury returned guilty verdicts against Bellanger on all counts. The district court adjudicated Bellanger guilty on two kidnapping counts, one for R.L. and one for J.D., and sentenced him to 96 months in prison on the first count and a consecutive 57-month prison term on the second count. This appeal follows.

## D E C I S I O N

## I.

Bellanger claims that his attorney was ineffective because he conceded guilt without Bellanger's consent. Bellanger argues that defense counsel admitted his guilt as

4

to the aiding-and-abetting false imprisonment charges in two separate statements during closing arguments. We disagree.

To prevail on an ineffective-assistance-of-counsel claim, Bellanger must show "(1) that his counsel's representation 'fell below an objective standard of reasonableness'; and (2) 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Nissalke v. State*, 861 N.W.2d 88, 94 (Minn. 2015) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 2064, 2068 (1984)). In evaluating an ineffectiveness-of-counsel claim the court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Dukes v. State*, 660 N.W.2d 804, 810 (Minn. 2003) (quotation omitted). "[J]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 811. But "when counsel for a defendant admits a defendant's guilt without the defendant's consent, the counsel's performance is deficient and prejudice is presumed. That is so because the decision to concede a defendant's guilt is the defendant's decision alone to make." *State v. Jorgensen*, 660 N.W.2d 127, 132 (Minn. 2003) (citations omitted).

"[E]ven implied concessions require client consent." *Dukes*, 660 N.W.2d at 812. An implied concession occurs when the attorney's statement, viewed in context, "would lead a reasonable person to conclude" that the defense attorney admitted the defendant's guilt. *Id.* While we do not condone a defense attorney's concession of guilt without client consent or acquiescence, the definition of an "implied admission" must not be construed to "allow the semantics of every questioned word, statement or misstatement of

5

counsel by inadvertence, negligence or perhaps cleverness to be an automatic ground for a new trial." *Id.*

The case against Bellanger was strong. Both victims and two of Bellanger's accomplices testified consistently. They all implicated Bellanger as the ring leader. Their stories were corroborated by the casino surveillance video. Also, Bellanger arguably admitted guilt in a jailhouse phone call that was played for the jury.

Faced with this evidence, Bellanger's attorney focused largely on credibility in his closing argument. He began by arguing that R.L. and J.D. were not credible witnesses because they were involved with drugs:

> I think you have no trouble, at this time, seeing that [R.L.] is a drug dealer, okay? The evidence that was presented over the last two days clearly shows that she was involved in selling, buying, using Methamphetamine. That's one of the State's witnesses. The State's other key witness, or alleged victim, is [J.D.]. It has to be clear to you that he, himself, is a Methamphetamine addict. During the time up until March 14th and March 15th, he had been using, injecting, Methamphetamine. . . . Because those two individuals are the State's key witnesses, you have reasonable doubt to believe their claims that they were kidnapped. They were not kidnapped.

Next, he attacked the credibility of Jones and White, arguing that they could not be believed because they testified against Bellanger in exchange for lighter sentences.

He also argued that J.D. willingly left the casino in search of more methamphetamine and that R.L. willingly left her friend's home to find more drugs. Accordingly, he claimed that no crimes were committed until the group went to Wind's home. He then argued that Bellanger did not duct-tape anyone at Wind's home. Because

6

J.D. and R.L. went willingly to Wind's home and Bellanger did not participate in duct-taping anyone, the attorney argued that Bellanger did not "remove[] from one place to another," "confine[]," or "restrain[]" J.D. or R.L. without their consent and therefore could not be convicted of "kidnapping" or "false imprisonment." *See* Minn. Stat. § 609.25, subd. 1 (requiring the actor to "confine[] or remove[] from one place to another, any person without the person's consent" to be guilty of kidnapping); Minn. Stat. § 609.255, subd. 2 (providing that whoever "intentionally confines or restrains . . . any other person without the person's consent, is guilty of false imprisonment").

After arguing that Bellanger could not be guilty of either kidnapping or false imprisonment, the attorney made the first statement Bellanger argues is an admission of guilt. He starts the statement by saying, "[t]he defendant's *only possible crime* in this situation is that he aided and abetted the false imprisonment of [J.D.] or [R.L.]." (Emphasis added). The attorney admits that if Bellanger knew the accomplices were going to commit crimes, was present, and intended his presence to aid in the commission of these crimes, then he is guilty of aiding-and-abetting false imprisonment. *See State v. Mahkuk*, 736 N.W.2d 675, 682 (Minn. 2007) (stating that state must prove knowledge of crime and intention to further crime to prove accomplice liability). But he couches his statements about Bellanger's possible guilt by saying "[i]f you believe," "you may believe," "[y]ou might believe," and "if that's the case."

After the first complained-of statement, the attorney continued to question the credibility of the state's witnesses. He argued that Jones, White, and Wind were not acting at Bellanger's direction because they all left for a period of time and decided of

7

their own volition to return to Wind's house. He pointed to R.L.'s history of drug convictions, called her a "drug dealer" and pointed out that she was on methamphetamine and was "deceptive" when she spoke with police. Similarly, he argued that when J.D. initially talked to police he looked to be under the influence and admitted to being out partying and doing drugs. He argued that R.L. did not like J.D. and that she may have willingly duct-taped J.D.'s ankles and poured alcohol down his throat. He further argued that no physical evidence shows that Bellanger was involved in confining, restraining, assaulting, or terrorizing J.D. and R.L. Then, right before the second statement Bellanger complains of, the attorney said, "[R.L.] and [J.D] were not kidnapped on March 14th and March 15th. Mr. Bellanger did not falsely imprison [R.L] and [J.D.]. He did not duct-tape [R.L.] or [J.D.]"

The second statement, like the first, is conditional and is not an admission of guilt. Again, the attorney starts out by saying, "[t]he only possible crime Mr. Bellanger could have committed was the aiding and abetting the false imprisonment of [R.L.] and [J.D.]." He then says, "[h]is presence, him intentionally being there, knowing that crimes were being committed—and they were committed—he is guilty of crimes as liability of crimes of another." But, he concludes the statement by saying, "the State's whole case is premised on reasonable doubt" and again questions the credibility of R.L. and J.D. Immediately after concluding the second statement, the attorney finishes his closing argument with another argument for acquittal on all charges, "John White, Robert Jones, and Darlene Wind pled guilty to stay out of prison. That agreement required them to testify against Mr. Bellanger. You have reason to doubt the claims against Mr. Bellanger.

8

And because you have reasonable doubt, as you've been instructed on the law, he is not guilty."

Bellanger's attorney argued his client's innocence as to all charges. The challenged statements merely present an alternative argument encouraging the jury, if it believed the state's witnesses, to convict only on the lesser-included offenses of aiding-and-abetting false imprisonment.[1] Because of the conditional language used, the context in which the statements were made, and the defense attorney's insistence in other portions of the argument that his client was not guilty of any of the charged crimes, we conclude that a reasonable person could not determine that the attorney's statements were an admission of guilt.

## II.

Bellanger next argues that the district court committed plain error affecting his substantial rights when it failed to instruct the jury on accomplice testimony. Bellanger did not request the jury instruction or object to the district court's failure to give the instruction. As a result, this court reviews the matter for plain error. *State v. Reed*, 737

---

[1] Although defense counsel appears to concede that Bellanger was present and that White, Jones, and Wind committed the offenses, this does not amount to a concession of guilt because accomplice liability cannot be imposed based on "mere presence." *State v. Jackson*, 746 N.W.2d 894, 898 (Minn. 2008); *see also Mahkuk*, 736 N.W.2d at 682 (requiring knowledge of crime and intention to further crime for accomplice liability). Considering the evidence that confirmed Bellanger was present and that crimes were committed, it would have been difficult if not impossible for the attorney to mount a credible argument that Bellanger was not there when the crimes occurred. *See Dukes*, 660 N.W.2d at 816-17 (concluding that defense attorney did not concede defendant's guilt to first-degree felony murder even though, based on strong evidence, defense attorney conceded that the actions of defendant and/or his accomplices caused the victim's death).

9

N.W.2d 572, 583-84 (Minn. 2007). "The plain error standard requires that the defendant show: (1) error; (2) that was plain; and (3) that affected substantial rights." *State v. Strommen*, 648 N.W.2d 681, 686 (Minn. 2002).

Pursuant to Minn. Stat. § 634.04 (2012), a defendant cannot be convicted based on the testimony of an accomplice unless that testimony is corroborated by other evidence showing that the defendant committed the offenses. "'[T]rial courts have a duty to instruct juries on accomplice testimony in any criminal case in which it is reasonable to consider any witness against the defendant to be an accomplice.'" *State v. Clark*, 755 N.W.2d 241, 251 (Minn. 2008) (quoting *Strommen*, 648 N.W.2d at 689). This duty comes from "the very real possibility that the jury could reject corroborating evidence and convict on the testimony of the accomplice standing alone." *State v. Barrientos-Quintana*, 787 N.W.2d 603, 610 (Minn. 2010) (quotation omitted).

"A witness is considered an accomplice if [he or she] could have been indicted and convicted for the crime with which the accused is charged." *Clark*, 755 N.W.2d at 251 (quotation omitted). Both White and Jones testified against Bellanger at trial. Both men pleaded guilty to kidnapping and false imprisonment charges arising out of this incident. White and Jones are accomplices and, as the state concedes, the district court committed plain error by failing to give an accomplice testimony instruction.

To prevail on the third prong of the plain-error test, Bellanger must show that "there is a reasonable likelihood that [the failure to give the instruction] had a significant effect on the jury verdict." *Barrientos-Quintana*, 787 N.W.2d at 612 (quotation omitted). In other words, we must determine whether there is a reasonable likelihood that the jury's

10

verdict would have been significantly affected if the jurors had known that they could not convict Bellanger unless the testimony of his accomplices was corroborated. *Id.* Accomplice testimony may not be corroborated solely by the testimony of another accomplice. *State v. Harris*, 405 N.W.2d 224, 227 (Minn. 1987).

The testimony of White and Jones was fully corroborated by the testimony of R.L. and J.D. Although there were small inconsistencies, both victims and both accomplices testified to essentially the same chain of events. They agreed that J.D. and R.L. were taken to Wind's home and restrained with duct tape. They agreed that the victims were repeatedly questioned about J.K.'s money, were beaten, and had alcohol poured down their throats. They also agreed that Bellanger was present during the entire episode, instigated the kidnapping, and oversaw or directly participated in the assaults on J.D. and R.L. In addition, the casino surveillance video, which shows Bellanger approaching J.D. at the casino and leaving the casino with J.D. and both accomplices, corroborates the accomplice testimony. Bellanger's statement that White and Jones "told on" him also corroborates their testimony that they committed the offenses with Bellanger.

Because the testimony of the accomplices was thoroughly corroborated, we conclude that there is no reasonable likelihood that the district court's failure to give the accomplice liability instruction had a significant effect on the verdict.

**Affirmed.**